IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MIMI MA,<br><br>　　　　　Plaintiff,<br><br>　　　　v<br><br>WESTINGHOUSE ELECTRIC COMPANY, LLC,<br><br>　　　　　Defendant. | )<br>)<br>)<br>)<br>)  2:11-cv-970<br>)<br>)<br>)<br>)<br>)<br>) |

**MEMORANDUM OPINION AND ORDER OF COURT**

　　　　Pending before the Court is DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Document No. 40) filed by Westinghouse Electric Company, LLC ("Westinghouse"), with brief in support.  Plaintiff Mimi Ma ("Ma") filed a brief in opposition to the motion and Westinghouse filed a reply brief.  In addition, both parties have thoroughly developed their respective positions as to the Concise Statement of Material Facts ("CSMF") and have submitted numerous exhibits.  The motion is ripe for disposition.

Factual and Procedural Background

　　　　In this case, Ma claims that her employment was terminated due to discrimination based on her gender and/or religion, in violation of Title VII and the Pennsylvania Human Relations Act ("PHRA"). She also asserts a retaliation claim.  The parties agree that the claims are timely and that Ma exhausted her administrative remedies.

Ma is female, Muslim, and wears a head scarf. Ma applied for a position with Westinghouse in the fall of 2007.[1] On November 19, 2007 she was hired as Project Excellence Program Manager at a salary of $135,000 per year. Her duties included primary leadership responsibility for the Project Excellence ("PEX") program, a global effort to improve project management practices; provide a standard set of project management tools; and increase standardization in project execution. The goal was to improve how Westinghouse worked with its customers. Project Excellence had been underperforming since its inception. Viewing the record in the light most favorable to Ma, she was the only employee at the Monroeville facility who wore a head scarf and the only Muslim. Westinghouse does not keep records of religious affiliation and the managers who were deposed in this case did not know the religious affiliations of their employees.

When Ma began her employment, the Project Excellence program was part of the Customer 1st department and Ma reported to Rick Easterling. After two months, Easterling relocated to Sweden and Ma reported to Jeff Hydeman. In April 2008, Easterling prepared a Performance Review for Ma, with input from Hydeman.[2] The review was generally positive, noting inter alia that Ma had engaged very quickly; built a relationship network with her counterparts; mentored Nuclear Services project managers; been twice been asked to participate on Westinghouse-wide teams; kept senior management informed of her proposals; and was developing some very good and creative initiatives in project management. Ma was given a rating of P4. The review noted that although her performance appeared to exceed expectations, "it is too early to determine long term performance." Ma was directed to "continue to strive to

---

[1] Although not relevant to the merits of these claims, the parties agree that Ma failed to disclose on her application that she had been terminated from her prior employment at ESI.
[2] Hydeman rated Ma as "Needs Development" in two areas and commented: "Plans/strategy for Project Excellence has been slow in coming"; and "Need to start showing some results relative to improving the PE program." Easterling agreed with these comments. Easterling Deposition at 32-33.

make improvements in the Project Excellence program" and to "balance working on initiatives with solving day to day problems."

In August 2008, a new organization was created within Westinghouse called Nuclear Services Major Business Delivery ("MBD"). Michael Kaveney was appointed as Director of MBD. In the announcement of the new organization, it was explained that Kaveney would "have responsibility for Project Excellence and setting project management standards and processes globally." It was further explained that Ma would maintain her position as manager of Project Excellence and would report to Kaveney. Ma asserts that Project Excellence leadership was to be her responsibility. Response to CSMF ¶ 44.

The working relationship between Ma and Kaveney deteriorated quickly. One of Kaveney's first interactions with Ma was to discipline her for poor judgment in presenting a mock torture video to a global conference on August 28, 2008, while she was still in the Customer 1st group. Several days later, Ma told a mentor, Michele DeWitt, that Kaveney was rude and hostile to her.[3] Kaveney was more of a hands-on manager than either Easterling or Hydeman had been. Ma and Kaveney had numerous meetings from October 2008 through January 2009. In particular, Kaveney and Ma discussed his visions for Project Scorecard and Project Excellence in detail, and his displeasure with the lack of progress on the Project Excellence report card.

In February 2009, Ma complained to human resources that Kaveney was rude and condescending, withheld resources, withheld key information, excluded her from meetings, and assigned her responsibilities to others. In response, Clayton Jennings, the Human Resources Director of Nuclear Services, met with Kaveney to discuss the complaints. Kaveney then created a spreadsheet and timeline which detailed his interactions with Ma. Defendant's Exh. D.

---

[3] DeWitt worked in a different product line at Westinghouse and had no first-hand knowledge of Ma's performance.

Among other entries, the spreadsheet states that on September 5, 2008 Kaveney assigned Ma three priorities: (1) completion of the Project Excellence scorecard; (2) utilization of project scorecards for all projects in Nuclear Services; and (3) training of personnel worldwide to meet business segment goals. On October 24, 2008, Kaveney reinforced that the following priorities were required to be achieved prior to working on any "nice to haves": (1) need to have a Project Excellence scorecard in place; (2) deliver on a completed Sharepoint site with communication throughout NS by January; and (3) finalize C1st project to tackle PEX issues. The spreadsheet listed numerous dates on which Kaveney met with Ma regarding uncompleted tasks and deliverables. In the spreadsheet, Kaveney also documented his frustration that he often did not know where Ma was going or what she was doing. Further, Kaveney noted that he had "handed significant efforts over to others in group (Zuppinger and Zellner) that were Mimi's responsibility because I needed to get them done." Ma disputes the dates of some of the entries and does not recall being told that training was one of her priorities. On February 11, 2009, Kaveney and Ma met with Brenda Boyd, Manager of Human Resources for the Corporate Center to discuss her complaints.

On February 16, 2009, Ma sent an email to DeWitt to seek advice. Ma stated that the "heart of the matter" was that "Kaveney never intended to work with me from the outset, and he and Bill [Zuppinger] have made themselves the de facto PEX Leads." Ma stated: "I do not know for certain what motivated Kaveney & Bill to take this course of action." She also purported to quote the explanation given by Kaveney during the meeting for removing management responsibilities from her: "I have reduced your management role because I lost confidence in you due to your inability to meet deadlines. I have taken responsibility for PEX and given your work to others because you have not been able to manage." After detailing her

disagreement with many of Kaveney's criticisms of her performance, Ma states: "Kaveney's weak justification that I missed one or two deadlines does not constitute a strong enough reason for him to take such a drastic action . . . ." DeWitt testified that Ma never told her that she was being discriminated against, and that DeWitt never suggested that the situations were discriminatory. DeWitt Deposition at 23-24, 30. Ma conceded that she never used the word "discrimination," but testified that she did tell DeWitt that she was being treated differently and treated badly. Ma Deposition at 288-289.[4]

On March 17, 2009 Kaveney sent an email to Ma to ask about the status of certain projects and to express his desire, as "Project Champion," to attend a kickoff event. In actuality, the kickoff event had occurred that morning and Ma had not invited Kaveney. Ma's responses were unsatisfactory and Kaveney sent a series of followup emails. Eventually, Kaveney wrote: "Frankly, the tit for tat responses I'm receiving are unprofessional and they need to end. I have asked this twice now, but I'll ask a third time." Ma sent a reply email, which stated, in part, that her earlier responses were "concise and completely professional"; that contrary to Kaveney's belief Project Champions were <u>not</u> always present at kickoffs; and that if he had expressed interest, she would have invited him. Kaveney forwarded the entire email exchange to Boyd, with the following comment: "She never does anything wrong… This is going to deteriorate fast, how to coach, teach, train, and most importantly rely on someone who is never wrong? Venting…."

In May 2009, Kaveney and Ma had an email exchange regarding Project Scorecard Compliance Results. Kaveney noted that Ma had not told him of an illness which had caused her to miss a deadline by four work-days despite numerous reminders; instructed her to

[4] Ma further testified that in response, DeWitt said it seemed odd and suggested that "perhaps Mike has a problem with women or people with your religious background." Ma Deposition at 289. DeWitt denied making any such comment. DeWitt Deposition at 43.

communicate better and to build contingencies into her timing; and observed that "the time for trying to explain away your lack of delivery has long past [sic]." Kaveney then stated: "If this had been an isolated incident it could be understood: instead there is a six-plus-month pattern of excuses, explanations and justifications for any and all lack of delivery. You need to spend a whole lot less effort on trying to explain why it didn't happen and a whole lot more effort on making it happen." Ma replied that Kaveney had made "unfair and false accusations" in that: (1) the project was not four work-days late because she thought the deadline was Friday and she sent it the next Monday; and (2) there could not have been "numerous" reminders in person because they had only met in person once the prior week. Ma also stated: "I will not apologize for being a human being, and an unexpected health issue can trigger a delay for anyone." Ma also stated that the emails are an example of how "you [Kaveney] were clearly wrong."

In June 2009, Kaveney completed Ma's annual performance review. He rated her "-P2" for below expectations/not meeting objectives. The review recognized that Ma had worked hard to be involved with Project Excellence globally, had many new ideas, was recognized as a PMI professional and was a competent presenter. On the other hand, Ma was rated as "far from meeting expectations as a leader to achieve critical strategic goals" due to: (1) numerous instances of missed deadlines for key deliverables (scorecard metrics, SharePoint and monthly PEX metrics); (2) communications (surprised too often, emails too long and too many, lack of followup and consistency); and (3) poor perception of her leadership by executives as not visible or engaged, rushed/disorganized, and lack of followup. In addition, Kaveney expressed on the review: "Must be much more open to coaching and criticism. I've seen nearly zero instances of acceptance and responsibility for any mistakes or lack of delivery."

On July 14, 2009, Kaveney placed Ma on a Performance Improvement Plan ("PIP"), effective immediately.  In addition to the shortcomings identified in the review, the PIP noted that Ma had exhibited an unacceptable record of absenteeism.  The PIP was scheduled to last through September 30, 2009 and set forth an itemized list of performance objectives.  Ma was to provide a weekly status report, and Kaveney, Ma and Boyd would meet bi-weekly to discuss her progress.

Ma did not accept and refused to sign the PIP.  She explained that she did not regard it as a help, and did not believe that it was a process to improve her performance.  However, she testified that she did everything she could to meet the objectives of the PIP and the assignments given to her.  Deposition at 294-295.  On July 24, 2009, Ma sent a lengthy email which disputed many of the criticisms set forth in the performance review and PIP.  In this email, Ma claimed -- for the first time -- that she believed she was being discriminated against.  Ma Deposition at 288-289.

Kaveney, Boyd and Ma held numerous meetings pursuant to the PIP throughout July, August and September 2009, which Kaveney documented.  In the August 5, 2009 meeting memorandum, Kaveney noted that Ma's tone was "completely inappropriate" and that she "continued to communicate during this discussion that [she] did not see why [Kaveney] had an issue with this particular number."  In August, Ma notified Kaveney that she was going to take a three-week vacation.  Kaveney viewed this request as an indication that Ma was not committed to trying to improve her performance and told her that because there were only four weeks remaining in the PIP, it was an inopportune time to take a three week vacation.  Ma took the vacation.  Westinghouse decided to extend the PIP to October 15, 2009 to give Ma additional time for completion.  On September 15, 2009, Zuppinger sent an email to Kaveney regarding the

7

Project Excellence Steering Committee to report that "the Core Team is frustrated" by the perceived lack of organization and executive involvement to reinvigorate the project.

On October 28, 2009, Kaveney and Boyd terminated Ma's employment at Westinghouse. The Termination Letter stated that Ma's conduct had caused the termination due to: (1) Work Performance Not Meeting Expectations; and (2) the failure to treat other employees with dignity and respect. The Termination Letter explained: "The tone and content of these communications have at times been extremely disrespectful and borderline insubordinate. This type of behavior is unacceptable and can not be tolerated." The letter further stated that although management had tried to help Ma succeed, "your behavior has generally been resistant to our efforts." Ma was replaced by Zuppinger, a non-Muslim male.

Standard of Review

Summary judgment must be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The movant must identify those portions of the record which demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). To withstand summary judgment, the non-movant must show a genuine dispute of material fact by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). A dispute is "genuine" only if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 249 (1986).  In resolving a summary judgment motion, the Court must draw all reasonable inferences and construe the evidentiary record in the light most favorable to the non-moving party.  *Id*. at 255.  Similarly, credibility determinations are the province of the jury, not the Court.  *Id*.

Legal Analysis

This is a "pretext" case, under the familiar McDonnell-Douglas burden-shifting analysis. For the purpose of this motion, Westinghouse concedes that Ma has established a prima facie case for gender discrimination, religious discrimination, and retaliation.  Ma recognizes that Westinghouse has articulated legitimate, non-discriminatory reasons for her discharge.  Thus, the burden shifts back to Ma to show that Westinghouse's asserted reasons were pretextual.  *See Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 187 (3d Cir. 2003) (same pretext analysis governs discrimination and retaliation claims).

The burden to establish pretext is a difficult one.  *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994).  A plaintiff must demonstrate such "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered reasons for its action that a reasonable factfinder could rationally find them unworthy of credence."  *Id.* at 765.

Plaintiff may meet her burden by introducing evidence from which a fact finder could either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory or retaliatory reason was more likely than not a motivating or determinative cause for the employer's actions.  *Id*. at 764.  She may do so by "contradict[ing] the core facts put forward by the employer as a legitimate reason for its decision." *Kautz v. Met-Pro Corp.*, 412 F.3d 463, 467 (3d Cir. 2005).  If "the defendant proffers a bagful of legitimate

reasons," a plaintiff may cast "substantial doubt on a fair number of them," such that it "may impede the employer's credibility seriously enough so that a factfinder may rationally disbelieve the remaining proffered reasons." *Fuentes,* 32 F.3d at 764 n. 7.  Moreover, the Third Circuit has instructed courts to review the record as a whole and "concentrate not on individual incidents, but on the overall scenario." *Bray v. Marriott Hotels*, 110 F.3d 986, 991 (3d Cir. 1997) (quoting *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1484 (3d Cir. 1990)); *see also Aman v. Cort Furniture Rental Corp.,* 85 F.3d 1074, 1083 (3d Cir. 1996).  Thus, the Court must determine if the totality of the evidence permits a reasonable factfinder to infer that Ma was terminated due to discrimination or retaliation.

On the other hand, it is well-established that an employee's mere disagreement with her performance evaluation does not prove pretext.  This Court will not second-guess the managerial judgments of employers.  *Brewer v. Quaker State Oil Refining Corp*., 72 F.3d 326, 332 (3d Cir. 1995).  In *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1108 (3d Cir. 1997), the United States Court of Appeals for the Third Circuit explained that "[t]he question is not whether the employer made the best, or even a sound, business decision; it is whether the real reason is [discrimination]."  In *Keller*, the court further explained that to survive the summary judgment stage, a plaintiff must show that the employer's decision "was so plainly wrong that it cannot have been been the employer's real reason."

Moreover, a prior good evaluation cannot establish that a later unsatisfactory evaluation is pretextual.  *See Turner v. Schering-Plough Corp*., 901 F.2d 335, 343-44 (3d Cir. 1990).  This is particularly true when the evaluations are performed by different supervisors and similar criticisms are set forth in both evaluations.  *See id; Accord Billet*, 940 F.2d at 825-26.  In this

case, Easterling, Hydeman and Kaveney all agreed that the plans for Project Excellence had been slow in coming and that Ma needed to start showing results to improve the program.

After a thorough review of the evidentiary record in this case, and with due deliberation, the Court concludes that Ma has failed to demonstrate pretext. There is not the slightest hint of discriminatory or retaliatory animus in this case. To the contrary, all of Kaveney's criticisms are objective and task-related. Kaveney and Ma may have had legitimate disagreements and misunderstandings regarding deadlines and priorities. It appears that there may have been some sort of power struggle between Ma and Kaveney regarding leadership of the Project Excellence effort. Ma may also have achieved some of her objectives in a timely manner or had justifiable reasons for some delays. The Court has construed all of the disputes regarding specific deadlines and deliverables in the light most favorable to Ma. Nevertheless, it appears to be essentially undisputed that Ma and Kaveney had a dysfunctional and adversarial relationship, and that Kaveney had lost confidence in Ma's ability to achieve results. Ma concedes that she did miss some deadlines. It is also undisputed that Kaveney re-assigned some of Ma's responsibilities to other employees.

It is certainly essential for an executive such as Kaveney to be able to trust and have confidence in the managers who report to him. The loss of such trust is a legitimate, non-discriminatory reason for termination. *See, e.g., Dowling v. Citizens Bank,* 295 Fed. Appx. 499, 504 (3d Cir. 2008) ("Her supervisor's loss of confidence in her as a manager was neither pretextual nor improper.") The position of Westinghouse is not weak, implausible, inconsistent, incoherent, or contradictory. To the contrary, all of Ma's supervisors recognized that even though she had good ideas, it was important that she deliver actual results.

There is also strong evidence to support the assertion that Ma was fired due to a lack of deference and respect towards Kaveney. The record reflects instances in which Ma: (1) failed to invite Kaveney to a kickoff meeting; (2) disputed the accuracy or necessity of Kaveney's requests; (3) told him that he was "clearly wrong"; and (4) refused to apologize. Kaveney was not required to tolerate such conduct from his subordinates. *See Helfrich v. Lehigh Valley Hosp.*, 2005 WL 670299 (E.D. Pa. 2005). In sum, there is no factual basis by which a reasonable jury could find that the articulated concern of Westinghouse for insubordination/disrespect was pretextual.

Moreover, the record is clear that Ma was not open to coaching and guidance from Kaveney. The record is silent with respect to any instance in which Ma agreed with Kaveney that she had erred, apologized, and took responsibility for her mistake(s). Ma did not view the PIP as an effort to provide help and support. To the contrary, she refused to sign it and then took a three-week vacation as the program was concluding, despite Kaveney's warning that the timing was inopportune. Westinghouse understandably interpreted the vacation as a sign that Ma was not motivated to successfully complete the PIP and that she was resistant to that effort. On this record, no reasonable jury could find that Westinghouse's reasons for terminating Ma's employment were pretextual.[5]

Accordingly, DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Document No. 40) will be **GRANTED**.

An appropriate Order follows.

McVerry, J.

---

[5] It is particularly difficult to understand how the conduct of Westinghouse could be a pretext for retaliation because Ma was given a poor review and placed on a PIP before she complained of discrimination. *Helfrich*, 2005 WL 670299 at * 20.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **MIMI MA,** <br> Plaintiff, <br><br> v <br><br> **WESTINGHOUSE ELECTRIC COMPANY, LLC,** <br> Defendant. | ) <br> ) <br> ) <br> ) 2:11-cv-970 <br> ) <br> ) <br> ) <br> ) <br> ) |

## ORDER OF COURT

AND NOW this 26th day of April, 2013, in accordance with the foregoing Memorandum Opinion, it is hereby ORDERED, ADJUDGED and DECREED that DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Document No. 40) is **GRANTED**. The clerk shall docket this case closed.

BY THE COURT:

s/Terrence F. McVerry
United States District Judge


cc:     **Jean E. Novak, Esquire**
        Email: jnovak@smgglaw.com
        **David A. Strassburger, Esquire**
        Email: dstrassburger@smgglaw.com
        **E. J. Strassburger, Esquire**
        Email: ejstrass@smgglaw.com

        **Shelly R. Pagac, Esquire**
        Email: srp@pietragallo.com
        **William Pietragallo, II, Esquire**
        Email: wp@pietragallo.com